[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10990
_____

D.C. Docket No. 1:10-cr-20410-JAL-11

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ARTRELL TERRANCE GRAY,
a.k.a. Trelly,
JONATHAN GIOVANNI MORLEY,
a.k.a. Yoshi,
TREMAINE EDWARD KALE,
a.k.a. Main,
DEXTER EARL KEMP,
a.k.a. Boss,
a.k.a. Dex,
RAHMIN J. JEFFERSON,
a.k.a. "LT",
SAHEED RASHEED THOMPSON,
a.k.a. Barney,
a.k.a. Bob,
ANTWAN ROSHAX GRAY,
a.k.a. Sugie,

Defendants - Appellants.

_____

No. 12-11856
_____

D.C. Docket No.  1:10-cr-20410-JAL-14

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SHAHEED RASHARD THOMPSON,
a.k.a. Heed,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 15, 2013)

Before CARNES, Chief Judge, WILSON and FAY, Circuit Judges.

PER CURIAM:

In this consolidated appeal, eight defendants challenge their convictions and sentences for drug, firearm, and identity-theft crimes.  We affirm.

2

## I.   BACKGROUND

A. <u>The Drug Conspiracy</u>

This case arose from local investigations by the Miami Gardens Police Department ("MGPD") into sales of crack cocaine, cocaine, marijuana, and MDMA/Ecstasy.  In early 2009, MGPD detectives met with Federal Bureau of Investigation ("FBI") Agents Lionel Lofton and Daniel Gaitan to enlist their assistance in investigating drug sales.  The FBI used a confidential informant ("CI") to arrange drug purchases.

On May 11, 2009, the CI called defendant Shaheed Rashard Thompson ("Rashard Thompson") and asked to buy 7 grams of cocaine for $200.  On May 20, 2009, the CI, wearing a body wire and under police surveillance, was told by Rashard Thompson to purchase 7 grams of cocaine from defendant Antwan Roshax Gray ("Antwan Gray").  The CI then arranged to purchase another 7 grams from Antwan Gray on May 27, 2009, when the CI wore a recorder and a hidden camera.  On June 10, 2009, the CI arranged to purchase 21 grams of cocaine for $600 from Antwan Gray, but received a bag of "cut," consisting of lidocaine and caffeine, which is not cocaine.  When the CI refused to confront Antwan Gray about the faux cocaine, the FBI terminated his services.

Based on the information given by the CI and his drug purchases from Antwan Gray, the use of surveillance, pole cameras, pen registers, and other

3

investigative methods, the FBI obtained a court order authorizing the wire intercept of Antwan Gray's mobile phone.  The wire intercept commenced on August 28, 2009, and was extended for an additional thirty days until October 24, 2009.  On October 23, 2009, the officers commenced another thirty-day, court-authorized intercept of Antwan Gray's other mobile phone.  Approximately 8,000 mobile and "walkie-talkie" calls were recorded; FBI Agent Lofton listened to all of them.  Agent Lofton qualified as an expert in deciphering the coded language used in the calls; he identified some of the drugs based on prices and interpreted words and phrases.  FBI Agent Gaitan also listened to the calls and transcribed those calls admitted into evidence at trial.  These wire intercepts recorded conversations between Antwan Gray and all of the defendants, with the exception of defendant Rahmin J. Jefferson, and consisted of discussions of drugs deals, sources, and deliveries.

On November 9, 2010, a federal grand jury returned a forty-six-count, superseding indictment against the eight appellants.[1]  Following unsuccessful pre-

---

[1] The counts at issue on appeal are: Count 1, conspiracy to possess with intent to distribute 50 or more grams of crack cocaine, 500 or more grams of cocaine, 50 or more kilograms of marijuana, and a detectable amount of Ecstasy/MDMA, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), (b)(1)(B)(ii), (b)(1)(C), 846 (all defendants); Count 5, possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1) (Jefferson); Count 8, possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Antwan Gray, Artrell Terrance Gray ("Artrell Gray"), Tremaine Edward Kale, Dexter Earl Kemp, Saheed Rasheed Thompson ("Rasheed Thompson"), and Jefferson); and Count 13, possession with intent to use unlawfully and transfer unlawfully 5 or more

4

trial motions, the case proceeded to trial.  The trial lasted six weeks; all defendants were convicted.

## B. Trial Evidence

The government's evidence consisted primarily of the wiretapped recordings and testimony of police officers, federal agents, and cooperating co-defendants, who had pled guilty.  Regarding the individual appellants, the government presented the following evidence.

## 1.  Antwan Gray

One hundred and three recorded calls were admitted into evidence, where Antwan Gray and various individuals, including all appellants except Jefferson, discussed drug deals, sources, and deliveries.  Jerome McMillian, a co-defendant who pled guilty, testified Antwan Gray had supplied marijuana, cocaine, and MDMA to him from May 2009 to June 2010.  McMillian had many conversations with Antwan Gray concerning drug sales and had watched him package drugs. McMillian estimated that, in 2008 and 2009, Antwan Gray sold at least an ounce of cocaine, a half-pound of marijuana, and 50 to 100 MDMA pills every week or two weeks from various locations.  In 2009, Antwan Gray told McMillian that he and

---

identification documents and false identity documents, in violation of 18 U.S.C. §§ 1028(a)(3) and 2 (Jonathan Giovanni Morley).

Artrell Terrance Gray ("Artrell Gray") were living at "the four," [2] and McMillian observed drugs being packaged and sold there. When McMillian could not fill drug orders, he referred customers to Antwan Gray, Rashard Thompson, Kemp, and Kale.

Sherline Richard, Antwan Gray's former girlfriend and co-defendant, testified concerning the drug-dealing activities. Richard lived with Antwan Gray in North Miami Beach with Morley and Sonia Charles (Morley's then-girlfriend), and knew Antwan Gray sold marijuana, cocaine, and MDMA. Richard assisted Antwan Gray by allowing him to use her Lexus for drug deals or by driving him herself. She picked up and kept some of Antwan Gray's larger drug purchases, took calls, and delivered drugs for him. Richard estimated Antwan Gray sold at least $400 to $500 of marijuana, cocaine, and MDMA each week. She also frequently went with Antwan Gray to purchase "cut."

From September 2009 to March 2010, Sherline Richard and Sonia Charles hired a local gang to break into cars at school parking lots, where they stole purses and briefcases in order to obtain identification documents, checks, and credit cards. Antwan Gray stored the documents used in the identity-theft scheme operated at "the four" and delivered identification documents to Richard. Antwan Gray went

---

[2] "The four" was the home where brothers Antwan and Artrell Gray lived at 3001 NW 174th Street in Miami Gardens. It was one of the processing locations for the drug sales. Sherline Richard, Antwan Gray's then-girlfriend, testified "the four" was where drugs were packaged, sold, and stored, and Antwan Gray kept his guns there.

6

with Richard to stores and banks, where he addressed her by the name on a victim's check in order to buttress her use of the victim's identification documents. Antwan Gray also used victims' credit cards to buy gas.

In November 2009, the police searched Antwan Gray's home and found a loaded gun containing a .357 caliber magazine, fifteen rounds of Winchester .357 ammunition, and a pair of men's shorts with baggies of cocaine in his bedroom. The police also located numerous identification documents, checks, deposit slips, driver's licenses, and notebooks with personal identification information for eleven victims. When Antwan Gray was arrested on June 3, 2010, the officers found a shoe box containing $1,589 in cash in the bedroom closet and 482.1 grams of marijuana under the driver's seat in his car.

2. Artrell Gray

Artrell Gray was intercepted discussing drug deals through the wiretaps. There were thirteen recorded calls, including calls in which Artrell and Antwan Gray discussed drugs. Former co-defendants Sherline Richard and McMillian testified Artrell Gray was involved in the distributions of drugs with his brother Antwan Gray. In 2009, Antwan Gray told McMillian that he and Artrell Gray were living at "the four," and McMillian observed drugs being packaged and sold there. Richard testified Artrell Gray sold marijuana and cocaine with Antwan

7

Gray, and, in November 2009, handguns and two AK-47s were moved to Artrell Gray's house.

On November 17, 2009, officers executed a search warrant for "the four." Artrell Gray told the officers no narcotics or guns were there, but, if guns or drugs were found, they belonged to him. The officers found a marijuana grinder, a brick of sham marijuana, plastic baggies of various sizes, a heat sealer, scissors, a digital scale, a plate, and a spoon. They also found a gun loaded with three bullets, nine rounds of Winchester ammunition, and a backpack containing a digital scale, a hammer, measuring spoons and other utensils. Green baggies filled with a total of 25.5 grams of cocaine were found in a closet, and marijuana was found under a mattress. In Artrell Gray's bedroom, the officers located a press and metal plates used to compress marijuana, as well as Artrell's driver's license.

3. Jonathan Morley

At trial, FBI Agent Lofton testified there were several recorded calls in which Morley had discussions involving drug transactions. Morley used Antwan Gray's mobile phone to tell customers he was running the business while Antwan Gray was on a cruise. Morley told customers he would deliver their orders for cocaine and high-grade marijuana in a gray Lexus. During a search of Morley's residence on November 18, 2009, officers found a bag of marijuana, a yellow

8

plastic bag containing baggies, three scales, three bags of cocaine, and identification and other documents in the names of five identity-theft victims.

Sherline Richard testified she had observed Morley in drug interactions, receiving phone calls about drug dealing, and delivering marijuana and cocaine to customers. She also had seen drugs in Morley's apartment. Morley was involved in the identity-theft scheme with Sonia Charles and Richard. On one occasion, Charles broke a car window and grabbed a purse from the front seat; Morley drove her away. Morley also drove Richard and Charles to a bank and watched outside for police while they used stolen identity documents. Morley additionally called Bank of America and impersonated a male identity-theft victim.

4. Tremaine Kale

The evidence against Kale included testimony from FBI Agent Lofton regarding phone calls in which Antwan Gray and Kale discussed marijuana, digital scales, and MDMA. Some of the conversations concerned one pound of marijuana, an unspecified amount of MDMA, 7 grams of cocaine, and an unspecified amount of marijuana.

Former co-defendant McMillian testified that when he could not fill drug orders, he referred customers to Kale. McMillian also testified Kale sold marijuana, cocaine, and MDMA from his residence. In addition, Kale told McMillian that Agent Lofton failed to find a ziplock bag of crack cocaine hidden

9

in a space behind his car stereo during a search of Kale's car.  McMillian testified he had observed Kale in Miami Gardens with a gun.  Sherline Richard testified she had seen Antwan Gray purchase cocaine from Kale two or three times, heard them discuss cocaine on the phone, and had observed Kale showing Antwan Gray a gun in his waistband.  Richard also noticed a gun resting on the wall in the yard where Kale lived and sold drugs.

On October 6, 2009, detectives found two empty ziplock bags, a ziplock bag with less than 28 grams of cocaine, a shotgun shell, and a 9-millimeter bullet in Kale's car.  On November 17, 2009, during a search of Kale's home, agents recovered digital scales, two small bags of cocaine, one small bag of crack cocaine, and shotgun shells.  A search of Kale's vehicle on December 16, 2009, revealed a bag of marijuana on the front seat, a 12-gauge Winchester shotgun shell, and one 20-gauge Winchester shotgun shell on the driver's floorboard.  A MGPD detective found 48.1 grams of marijuana in Kale's waistband during a pat-down search on June 1, 2010.

Kale testified at trial and denied ever selling drugs for any of his co-defendants, or ever selling drugs after 2006.  He stated the drugs found in his car and home were for personal use.  He testified he had scales so he could weigh drugs for his use, and he used small plastic bags for travel-size amounts.  Kale admitted buying five bags of marijuana, and one ounce of marijuana for personal

use.  He identified his voice on a recorded call concerning 7 grams of cocaine.

Kale testified that, during the 3 to 4 years prior to his 2006 conviction for

possession and distribution of marijuana, he sold one pound of marijuana each

month and carried guns for protection.

5.  Dexter Kemp

FBI Agent Lofton testified Kemp was heard discussing drug dealing with

Antwan Gray in the wiretapped calls.  He was heard discussing marijuana,

negotiating the purchase of it, and asking Antwan Gray to deliver drugs to a third

party.  Former co-defendant McMillian, who received drugs from Kemp from 2009

to 2010, testified that when he could not fill drug orders, he referred customers to

Kemp.  Sherline Richard testified Antwan Gray and Kemp met two or three times

each week and supplied each other with MDMA.  Richard also observed Kemp

carrying a semiautomatic gun equipped with a laser beam.

Several searches produced evidence used against Kemp during trial.  On

September 30, 2009, detectives observed Kemp's car departing from the house of a

co-conspirator who later pled guilty; they stopped the vehicle because of

excessively tinted windows.  Kemp consented to a search and the detectives found

MDMA pills and marijuana in the compartment behind the door handle.[3]  On

---

[3] Following his arrest, Kemp called Antwan Gray from the back seat of the officers'
vehicle and warned him to be careful because he had just been arrested with drugs.

November 18, 2009, while a search was occurring at Morley's home, officers again stopped Kemp for the excessively dark-tinted windows of his car. A drug dog alerted to marijuana in the trunk. A box containing 8 rounds of 9-millimeter cartridges was located in the compartment on the back of the front passenger's seat.

On March 23, 2010, FBI Agent Lofton and other FBI agents went to another house on the street of "the four" to locate Kemp. During a protective sweep of the house, the officers observed marijuana residue in an open bag, a small digital scale, a metal sifter, and a bottle of prescription pills on the bedside table. The officers also found 48 baggies of marijuana hidden behind the television in Kemp's bedroom, a photograph of a birthday cake for Kemp labeled "Boss," and a button stating "MGT, BOSS" (referring to rap group "Myrtle Grove Taliban").[4] R45 at 205, 207-09. In Kemp's closet the officers located a gun holster and a gun box for a Ruger 9-millimeter gun containing an empty magazine and magazine holder, the same caliber as ammunition found in Kemp's car on November 18, 2009. After waiving his *Miranda* rights,[5] Kemp explained he had bought ammunition at a gun store in Hialeah, Florida, that did not conduct criminal background checks; the

---

[4] Myrtle Grove was the area of Miami Gardens where the defendants sold drugs.

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

officers showed him the box for the Ruger 9-millimeter gun found in his bedroom, but Kemp insisted he no longer had it.

6. Rahmin Jefferson

On September 16, 2009, while observing defendant Rashard Thompson's home, detectives followed a Mustang as it drove away from the house and stopped it after it failed to stop at four stop signs. Jefferson nervously exited the car. When told the detectives had summoned a drug dog, Jefferson responded the dog might react to incense. He pulled out a plastic bag containing white powder, a digital scale, and batteries, explaining, "It's not real dope. I sell it as dope."[6] R37 at 137. A MGPD detective observed a loaded gun equipped with a magazine containing thirteen rounds of ammunition under the driver's seat. When Jefferson was seated in the police vehicle and was told the gun had been found, Jefferson said, "That's why I didn't want you to search the vehicle." R37 at 238. The officers also seized $1,211 in cash and papers listing several of his co-defendants, including Morley and Antwan Gray, their Social Security numbers, and a routing number for a Bank of America account.

Jefferson testified he had never sold any drugs to his co-defendants or bought drugs from them. He did admit he had been convicted for selling drugs in the past. He described his arrest on September 16, 2009, as occurring one

---

[6] The lab analysis confirmed that it was not cocaine.

13

afternoon as he arrived at his house.  He said the Mustang he was driving was his girlfriend's rental car.  Officers stopped him and told him to roll down the car windows.  When they looked inside, they said he should tell them about anything he had in the car prior to the arrival of a K-9 officer.  Jefferson told the police he had some incense in the car and gave them the bag.  He removed cash from his pockets.  While searching the car, officers found a gun on the driver's side.  Jefferson said it was not his gun; he had borrowed the car from someone else.

7.  Rashard Thompson

Trial evidence against Rashard Thompson included: (1) the evidence produced as a result of the CI's involvement; (2) FBI Agent Lofton's testimony regarding the wiretapped phone calls in which Rashard Thompson discussed drug dealing with Antwan Gray and recorded phone calls admitted into evidence; and (3) former co-defendant McMillian's testimony that he referred customers to Rashard Thompson, that McMillian bought five pounds of marijuana from Rashard Thompson, and that Rashard Thompson sold marijuana, cocaine, and crack cocaine.  Sherline Richard testified she had observed Rashard Thompson buy marijuana from Antwan Gray and had heard them discuss drug deals.  Following Rashard Thompson's arrest on June 3, 2010, and his wife's consent to search his home, officers found two digital scales and ziplock baggies in a dresser drawer,

along with numerous glass beakers, baking soda, and an elongated coat hanger used for manufacturing crack cocaine in the kitchen cupboard.

8.  Saheed Rasheed Thompson ("Rasheed Thompson")

FBI Agent Lofton testified regarding the recorded calls between Antwan Gray and Rasheed Thompson, in which they had discussed drug deals. In addition, former co-defendant McMillian testified that between 2009 and 2010, Rasheed Thompson sold drugs and McMillian bought 300 MDMA pills from him while working with him to supply crack cocaine to their customers. In one recorded conversation with Antwan Gray, McMillian discussed failed efforts of Rasheed Thompson's partner to convert 14 grams of cocaine into crack cocaine. McMillian had arranged for his cousin to do the "cooking," which produced a 12-ounce crack "cookie" that McMillian and Rasheed Thompson delivered to Rasheed's partner. R32 at 231-34. Sherline Richard testified she had observed Antwan Gray buying marijuana from Rasheed Thompson several times and had heard them talk on the phone about drug deals.

On May 11, 2010, detectives stopped Rasheed Thompson in a red Camry because it had been reported stolen. Rasheed Thompson and the driver, his girlfriend, were arrested. One of the detectives found a Ruger 9-millimeter gun with 9 rounds in the magazine in the center console.

15

C. <u>Motions and Convictions</u>

All of the defendants moved for judgments of acquittal at the end of the government's case and at the conclusion of all the evidence, which were denied. Of the counts challenged on appeal, all defendants, with the exception of Jefferson, were convicted of conspiracy to possess with intent to distribute controlled substances (Count 1); Jefferson was convicted of possession of a firearm by a convicted felon (Count 5); Artrell and Antwan Gray, Rasheed Thompson, Kemp, and Kale were convicted of possession of a firearm in furtherance of a drug-trafficking crime (Count 8); and Morley was convicted of the transfer of false identity documents (Count 13).

Kale moved for judgment of acquittal notwithstanding the verdict on Count 8; Rasheed Thompson and Kemp filed unopposed motions to join. The motion for judgment of acquittal was denied. All defendants were sentenced to substantial imprisonment terms.[7] On appeal, the defendants challenge the denial of their motions to suppress; the admission of evidence under Federal Rule of Evidence 404(b); the sufficiency of the evidence regarding Counts 1, 5, 8, and 13; jury instructions; the denial of motions to sever; and various sentencing issues.[8]

---

[7] The convicted defendants received the following imprisonment sentences: Antwan Gray, 444 months; Artrell Gray, 157 months; Morley, 276 months; Kale and Kemp, 420 months; Jefferson, 87 months; Rashard Thompson, 252 months; and Rasheed Thompson, 181 months.

[8] We find that the defendants' remaining arguments on appeal are meritless and do not warrant further discussion, because: (1) they failed to raise an inference of purposeful

16

## II.    DISCUSSION

### A. Denial of Suppression Motions

Several of the convicted defendants challenge the district court's denial of various motions to suppress.  We review a district court's factual findings in denying a suppression motion for clear error and the application of law to those facts de novo.  *United States v. Lewis*, 674 F.3d 1298, 1302-03 (11th Cir. 2012).  When considering a ruling on a motion to suppress, "all facts are construed in the light most favorable to the prevailing party below"; "we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit."  *Id.* at 1303 (citations and internal quotation marks omitted).  We may affirm the denial of a motion to suppress on any ground supported by the record.  *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010).

---

discrimination to establish a claim pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986); (2) the district court did not abuse its discretion in admitting the summary calculations and chart, since the summaries were based on an interpretation of the recorded conversations admitted into evidence, recordings not admitted but provided to the defendants prior to trial, narcotics seized and admitted into evidence, and FBI Agent Lofton's expert testimony; (3) the government's opening and closing statements, even if improper, did not prejudicially affect the substantial rights of the defendants; (4) the district court did not err in denying Morley's request for a limiting instruction since, as discussed subsequently in Section  II.E., Severance Motions, the firearms evidence was relevant, and any error was harmless in light of the overwhelming evidence of his guilt; and (5) the district court did not abuse its discretion in giving the jury a trial transcript during deliberations.

1. Wiretap Evidence

Antwan Gray, Rashard Thompson, and Morley contend the district court erred by denying their motions to suppress wiretap evidence because the government's affidavit not only failed to show necessity for the wire intercept but also contained material omissions and misrepresentations of facts. They argue the omitted or misrepresented facts abrogated the court's findings of probable cause and necessity, which required a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978). They further allege FBI Agent Lofton's wiretap affidavit failed to give the reasons for the CI's termination and concealed his unreliability.[9]

An application for an order authorizing a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The affidavit need not show a "comprehensive exhaustion of all possible techniques." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). Section 2518 was not intended "to foreclose electronic surveillance until every other imaginable method of

---

[9] Antwan Gray additionally challenges the wiretap affidavit because it failed to disclose that the officers "lost contact" with the CI during the drug purchases. Because he did not raise this issue in the district court, we review for plain error. *See United States v. Young*, 350 F.3d 1302, 1305 (11th Cir. 2003). Any error in the failure to disclose this fact in the affidavit did not affect substantial rights, because (1) the CI wore a body wire and recorder at every meeting, and (2) the affidavit explained the officers had to park a certain distance from the controlled purchase sites.

18

investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)).  The statute "does require the Government to show why alternative measures are inadequate for this particular investigation." *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (per curiam) (citation and internal quotation marks omitted).  A wiretap may be necessary when needed to determine the scope of the conspiracy and all of its members.  *See United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010).

The district court found the government employed extensive surveillance and pole-camera monitoring, used pen registers, and made controlled purchases prior to applying for a wiretap, but those methods had inherent limitations.  Drive-by surveillance was compromised by the presence of an official vehicle in the neighborhood, and the pole camera was limited by natural obstructions, including shrubby and weather.  Significantly, physical surveillance would not show what was occurring inside the home, the full scope of the conspiracy, or lead to the identification of all co-conspirators.  *See De La Cruz Suarez*, 601 F.3d at 1214.  The district court properly determined the government established necessity.

Entitlement to a *Franks* hearing requires a defendant to make a "substantial preliminary showing" establishing (1) the affiant deliberately or recklessly included a false statement, or failed to include material information, in the warrant affidavit; and (2) the allegedly false statement or omission was necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56, 98 S. Ct. at 2676. "Allegations of negligence or innocent mistake are insufficient." *Id.* at 171, 98 S. Ct. at 2684. The defendant's attack must be "more than conclusory," *id.*, and "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause," *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

In their initial motions to suppress, Antwan Gray, Rashard Thompson, and Morley failed to make a substantial preliminary showing that FBI Agent Lofton intentionally or recklessly omitted any facts in his affidavit. As the magistrate judge and the district court concluded, a *Franks* hearing was not warranted because the defendants' contentions were purely conclusory, and they failed to offer proof showing the affiant had the requisite intent. *See Franks*, 438 U.S. at 171, 98 S. Ct. at 2684.

During trial, Rashard Thompson renewed his motion to suppress the wiretap evidence. He argued the government concealed the CI's unreliability by omitting the fact, revealed during FBI Agent Gaitan's trial testimony, that the FBI

20

terminated the CI's services because he refused to confront Antwan Gray about receiving "cut" and the video of the second controlled purchase showed the CI almost inhaling cocaine. While the affidavit did not state these facts, the affidavit did state the CI was not able to deal directly with most of the drug organization and did not have the trust or knowledge of its members. The district court correctly determined the absence of the information concerning the failure of the CI to follow instructions did not affect the probable cause established by the supporting affidavit. *See Madiwale*, 117 F.3d at 1327.

2.  Residence Searches

Artrell Gray contends the district court erred by not suppressing evidence obtained from the search of his residence, because the government's application for a warrant was based on a knowingly false affidavit, and the motion to suppress was denied without a *Franks* hearing. He argues the statement in the affidavit that gang members were seen at his residence was false because a video showed the individuals were gathered near the location, not at or in front of his house. He also states the affidavit was misleading because it suggested something untoward was happening at his residence, when detectives had stopped at the scene and could observe the filming of a music video in progress. The district court found, however, that Artrell Gray failed to proffer evidence showing FBI Agent Lofton knew the information was false or misleading. *See Franks*, 438 U.S. at 171, 98 S.

21

Ct. at 2684 ("There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."). From our review of the record, we conclude this finding was not clearly erroneous. *See United States v. Jenkins*, 901 F.2d 1075, 1079-80 (11th Cir. 1990).

Moreover, the remaining averments in the affidavit were sufficient to provide probable cause for the search of the residence. While Artrell Gray argues the wire intercepts referenced in the affidavit were "stale" and could not establish probable cause for the search, this argument has no merit since the affidavit referred to wire intercepts as well as information provided by a drug purchaser only ten days prior. *See United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000) ("[E]ven assuming that [the information] was stale, such information is not fatal where the government's affidavit updates, substantiates, or corroborates the stale material." (citations and internal quotation marks omitted)).

Rashard Thompson argues the warrantless search of his home on June 3, 2010, violated his right to privacy, because his wife's consent to the search was not knowing and voluntary, there were no exigent circumstances, and it was not incident to arrest. A warrantless search of property is valid under the Fourth Amendment if it is preceded by a defendant's voluntary consent or the consent of a third party who has "common authority over or other sufficient relationship to the premises . . . sought to be inspected." *United States v. Harris*, 526 F.3d 1334,

1339 (11th Cir. 2008) (per curiam) (citation and internal quotation marks omitted). Because the voluntariness of consent is a question of fact, we will disturb the district court's finding on that issue only if it was clearly erroneous. *United States v. Zapata*, 180 F.3d 1237, 1240-41 (11th Cir. 1999).

Rashard Thompson argues his wife's consent to the search was not knowing and voluntary, since she acquiesced to official authority because of fear and the tense situation. Resolution of this claim turns on the credibility of the opposing witnesses at the suppression hearing. The magistrate judge found credible the officer's testimony that he advised Rashard Thompson's wife of her rights prior to executing the consent form, including her right not to consent to the search. The magistrate judge also found the officers interacting with Rashard Thompson's wife did not have their weapons drawn, and the record does not indicate she was coerced into executing the consent form. There was sufficient evidence to find that Rashard Thompson's wife freely and voluntarily executed the consent-to-search form. Therefore, the officers obtained evidence pursuant to a valid consent to search.

3. Firearm and Ammunition Seizure

Jefferson argues the district court erred in denying his motion to suppress the gun and ammunition seized during the search of his Mustang on September 16, 2009. He contends the officers lacked probable cause for the initial stop, the

23

search of the car, and his arrest.  A traffic stop is valid "if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*."  *Harris*, 526 F.3d at 1337 (referring to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)).  The officers observed Jefferson committing various moving violations, including driving through stop signs.  Therefore, the district court properly found Jefferson's initial traffic stop was lawful.  *See Whren v. United States*, 517 U.S. 806, 812, 116 S. Ct. 1769, 1773-74 (1996).

"[A]n officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879).  Unless there is an articulable suspicion of other illegal activity, the stop cannot last longer than necessary to process the traffic violation.  *Id.* (citing *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)).  "Reasonableness is measured by examining the totality of the circumstances."  *Purcell*, 236 F.3d at 1279.

After being stopped, Jefferson appeared nervous when he exited the Mustang.  The officers advised him that, because of his nervous behavior, a K-9 unit had been called.  While waiting for the K-9 unit, Jefferson voluntarily produced a bag containing a white powder which he indicated he sold as cocaine.

24

The drug-detection dog arrived "within a minute" of Jefferson's stop; shortly thereafter, the dog alerted to the bag that field-tested positive for cocaine and to the passenger compartment of the vehicle wherein the officers found a gun. R4-796 at 5. As the district court found, "[g]iven the short time that elapsed between the stop and K-9 search, in addition to Jefferson's exiting the vehicle and seeming nervousness, . . . the K-9 search was not unreasonable in time or scope." R4-796 at 5; *see also Purcell*, 236 F.3d at 1277-80 (concluding a 14-minute time period between the initial traffic stop and the driver's consent to search his car was reasonable). Because the officers had probable cause to stop Jefferson and his detention was not unconstitutionally prolonged, the evidence found following the K-9 search did not violate his Fourth Amendment rights.

The Supreme Court has clarified the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009). In *Gant*, the Supreme Court held "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351, 129 S. Ct. at 1723. Because Jefferson was arrested near the car he was driving, and he was not fleeing the scene or a sufficient distance away from his vehicle, the officer's search of his car was a lawful search incident to arrest. In addition, since

25

an MGPD detective had probable cause to arrest Jefferson for possession of cocaine, the search of the vehicle was also permissible because it reasonably could have yielded further evidence of drug crimes.

## B.  Admission of Gun Evidence Under Federal Rule of Evidence 404(b)

Rasheed Thompson argues the district court erred in admitting the testimony of MGPD Detective Velez regarding the gun discovered in a search of his girlfriend's rented car on May 11, 2010, because there was insufficient proof he possessed it.  Admission of evidence pursuant to Federal Rule of Evidence 404(b) is reviewed for abuse of discretion.  *United States v. Thomas*, 242 F.3d 1028, 1031 (11th Cir. 2001).  "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2005) (en banc).

Federal Rule of Evidence 404(b) forbids the admission of any evidence of prior bad acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  That evidence, however, may be admitted for some other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The test regarding the admissibility of prior acts evidence provides:

First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of [Federal Rule of Evidence] 403.

*United States v. Matthews*, 431 F.3d 1296, 1310-11 (11th Cir. 2005) (per curiam) (quoting *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995)).  In every conspiracy case, "a not guilty plea renders the defendant's intent a material issue," unless the defendant affirmatively makes it a non-issue.  *Id.* at 1311 (citation and internal quotation marks omitted).  Additionally, "the principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged, and regardless of whether the activity might give rise to criminal liability."  *Delgado*, 56 F.3d at 1365 (footnote omitted).

Regarding the first prong of the Rule 404(b) test, the evidence was relevant to an issue other than Rasheed Thompson's character, because he pled not guilty to the conspiracy offense.  The district court recognized that this court has "note[d] that guns are tools of the trade in drug trafficking and that guns and violence go hand in hand with illegal drug operations."  R37 at 56 (citing *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011); *United States v. Nixon*, 918 F.2d 895, 904 (11th Cir. 1990)).  The court found the evidence of the gun was relevant

27

to Count 1 and, on a *Pinkerton* theory,[10] relevant to Count 8 regarding the possession of a gun in furtherance of a drug-trafficking crime. The fact that Rasheed Thompson was arrested and a gun was found in his constructive possession was proof of both his intent to participate in the drug conspiracy and his knowledge that guns would be involved in the actions committed in furtherance of the conspiracy.

Concerning the second prong, the government was required to introduce "sufficient proof to enable a jury to find by a preponderance of the evidence that [Rasheed Thompson] committed the act(s) in question." *See United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007). While Rasheed Thompson argues he was not in actual possession of the gun, constructive possession was established by the location of the gun in the center console, and the fact that the gun was found in a stolen, rented vehicle his girlfriend was driving. There was evidence showing the co-conspirators often used rented cars to transport drugs, and Rasheed Thompson's known connection to selling drugs. The jury reasonably could have inferred he was carrying the gun as a form of protection, given the overwhelming evidence he was involved with drug dealing.

---

[10] Under *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180 (1946), "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof," as long as "the substantive crime was a reasonably foreseeable consequence of the conspiracy." *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) (citations and internal quotation marks omitted).

Under the third prong, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. If the issue of the defendant's knowledge or intent is determinative, it is less likely that Rule 404(b) evidence demonstrating knowledge or intent would be cumulative or prejudicial under Rule 403. *United States v. Gaskell*, 985 F.2d 1056, 1063 (11th Cir. 1993). Rasheed Thompson argues the minimal evidence against him showed he was not a part of the conspiracy. His argument emphasizes that the evidence regarding possession of the gun was vital in proving intent for Count 1 and his knowledge that a co-conspirator would carry a gun in furtherance of a drug-trafficking crime. Under the applicable Rule 404(b) test, the court did not abuse its discretion in permitting MGPD Detective Velez to testify concerning the gun found in the rented car Rasheed Thompson's girlfriend was driving, and in which Rasheed Thompson was riding.

C. Sufficiency of the Evidence

We review the sufficiency of the evidence to support a conviction de novo, viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor. *United States v. Bacon*, 598 F.3d 772, 775 (11th Cir. 2010) (per curiam). Evidence is sufficient "so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt."

*United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004).  Where a defendant moves for judgment of acquittal but fails to raise a specific ground to the district court, we will reverse the conviction only where it is necessary to prevent "a manifest miscarriage of justice."  *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013).

1.  Conspiracy to Possess with Intent to Distribute Controlled Substances (Count 1)

Artrell Gray, Kale, and Kemp challenge the sufficiency of the evidence to support their convictions for conspiracy to possess with intent to distribute controlled substances.[11]  To sustain a conviction for conspiracy to possess with intent to distribute a controlled substance, the government must prove beyond a reasonable doubt that (1) an illegal agreement to possess a controlled substance with the intent to distribute existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it.  21 U.S.C. §§ 841(a)(1), 846; *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005).  The evidence presented at trial against all of the defendants included two co-conspirators' testimony, recorded conversations between the defendants, and testimony from

---

[11] Rashard Thompson and Morley attempt to adopt their co-defendants' sufficiency-of-the-evidence arguments with regard to their convictions for conspiracy to possess with intent to distribute a controlled substance.  "Sufficiency arguments . . . are too individualized to be generally adopted."  *United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (citation and internal quotation marks omitted).  Therefore, we will not consider any sufficiency challenges to Count 1 by Rashard Thompson and Morley, because they did not raise this issue properly on appeal.  *See id.*

officers regarding evidence of narcotics obtained as a result of searches and seizures.

Kale contends that insufficient evidence supported his conspiracy conviction, because the indictment charged a single narcotics distribution conspiracy, but the evidence at trial proved a series of smaller conspiracies. "[T]o prove a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies, the government must show an interdependence among the alleged co-conspirators." *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004). To determine whether a jury could reasonably have concluded that the evidence established a single conspiracy, we consider (1) the existence of a common goal, (2) the nature of the underlying scheme, and (3) the overlap of participants. *United States v. Huff*, 609 F.3d 1240, 1243 (11th Cir. 2010). "While each defendant must have joined the conspiracy intentionally, each need not be privy to all the details of the conspiracy or be aware of all the other conspirators." *United States v. Dorsey*, 819 F.2d 1055, 1059 (11th Cir. 1987).

The jury found the evidence showed the defendants shared a common goal, the sale and distribution of drugs in Miami Gardens. The defendants, including Kale, cooperated by supplying, distributing, and/or facilitating the scheme. When former co-defendant McMillian could not fill an order for drugs, he referred customers to Antwan Gray, Rashard Thompson, Kemp, or Kale. The defendants

worked in concert to distribute narcotics, evidenced by the wiretapped conversations. In these conversations, the defendants discussed packing and repackaging cocaine, cutting, buying "cut," sharing drugs, providing drugs to one another, and owing money. The court specifically instructed the jury on single versus multiple conspiracies,[12] "and the convictions of the defendants are implicit findings that the evidence proved the existence of the single conspiracy alleged." *United States v. Jones*, 913 F.2d 1552, 1561 (11th Cir. 1990) (citation and internal quotation marks omitted). Furthermore, Kale testified he never sold drugs for any of his co-defendants and did not sell drugs after 2006. After hearing Kale's testimony and observing his demeanor, the jury could disbelieve Kale's testimony and could conclude the opposite of what Kale said was true. *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). The record shows the government presented sufficient evidence to allow a reasonable jury to conclude the defendants were involved in a single conspiracy.

Artrell Gray also argues the evidence produced at trial was insufficient to prove he had entered into the conspiracy. There was testimony from Antwan Gray's girlfriend, Sherline Richard, and former co-defendant McMillian that

---

[12] The jury was instructed that "[p]roof of several separate conspiracies isn't proof of the single overall conspiracy charged in the indictment unless one of the several conspiracies proved is the single overall conspiracy." R62 at 208-09. The jury further was instructed that it had to "decide whether the single overall conspiracy charged existed between two or more conspirators. . . . [And] if [it] decide[d] that a single overall conspiracy did exist, then [it] must decide who the conspirators were." R62 at 209.

32

Artrell Gray assisted his brother in drug dealing while they were living together at "the four." McMillian testified he observed drugs being packaged and sold at "the four," and Richard testified Artrell Gray allowed Antwan Gray to move guns to his house in November 2009. During the search of "the four," officers found baggies containing 25.5 grams of cocaine, a bag of marijuana, a press and metal plates used to compress marijuana, a marijuana grinder, and packaging materials. Additionally, the recorded calls admitted into evidence establish Artrell Gray knew of and voluntarily participated in the drug conspiracy. During these calls (1) Artrell Gray asked Antwan Gray how much he should charge for the drugs, (2) Artrell Gray told Antwan Gray there was marijuana in the closet at "the four" that a former co-defendant was trying to sell, and (3) Antwan and Artrell Gray discussed drugs and guns hidden at "the four." Viewed in the light most favorable to the government, this evidence was sufficient for a jury to find beyond a reasonable doubt that Artrell Gray not only knew of the illegal conspiracy but also voluntarily joined it.

Kemp argues the evidence established he was only an occasional purchaser and not a voluntary participant in the drug conspiracy. We disagree.[13] Former co-

---

[13] Kemp also argues, for the first time on appeal, there was insufficient evidence to support the jury's findings regarding the drug quantities involved in the conspiracy. We find no merit to his argument because the evidence, including the summary calculations and drug quantities chart, was more than sufficient, and the district court properly instructed the jury to decide whether the conspiracy involved the drug quantities alleged in the indictment.

33

defendant McMillian testified that, when he could not fill orders, he referred customers to Kemp, and he received drugs from Kemp from 2009 to 2010. The testimony of Antwan Gray's girlfriend, Sherline Richard, also established Antwan Gray and Kemp met two or three times each week and supplied each other with MDMA, when their individual supplies were depleted. FBI Agent Lofton testified, on the recorded phone calls, he heard Kemp discussing marijuana and MDMA/Ecstasy with Antwan Gray, and heard Kemp ask Antwan Gray if he had any marijuana or rolling papers.[14] Additionally, officers found marijuana residue, a small digital scale, a metal sifter, and forty-eight nickel and dime bags of marijuana in Kemp's bedroom. The trial evidence was sufficient for a jury to conclude beyond a reasonable doubt that Artrell Gray, Kale, and Kemp voluntarily participated in the conspiracy to possess with intent to distribute controlled substances.

2. Possession of a Firearm by a Convicted Felon (Count 5)

Jefferson argues the district court erred by denying his motion for acquittal or a new trial, because there was insufficient evidence to support his conviction for possessing a firearm as a convicted felon. Without objection, the government

---

[14] There were many recorded calls admitted into evidence in which Kemp discussed drug dealing with Antwan Gray. These include: (1) Kemp's telling Antwan Gray he had obtained a quarter pound of marijuana from Kale; (2) Antwan Gray's asking Kemp if he knew who had high quality marijuana available; and (3) Kemp's negotiating a marijuana purchase from Antwan Gray.

34

introduced copies of Jefferson's previous convictions for cocaine possession.  He contends there was no direct evidence linking him to the gun, because (1) MGPD Detective Velez's testimony was contradictory regarding whether Detective Velez or the drug dog found the gun, and (2) FBI Agent Lofton's testimony contradicted Jefferson's testimony.

Assessing witness credibility is a matter committed solely to the factfinder. *United States v. Hamaker*, 455 F.3d 1316, 1334 (11th Cir. 2006).  When the argument is the jury based its conviction on inconsistent testimony of government witnesses, the convicted defendant must show the testimony was "incredible as a matter of law" to warrant relief.  *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (per curiam) (citation and internal quotation marks omitted).  "For testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Thompson*, 422 F.3d 1285, 1291 (11th Cir. 2005) (citation, internal quotation marks, and alterations omitted).

Jefferson argues MGPD Detective Velez testified on direct examination he found the gun under the seat, but he testified on cross examination the drug dog found the gun, and he did not know who removed the gun from the car.  Detective Velez's testimony on cross examination that the drug dog found the gun in the car

35

is not necessarily inconsistent with his testimony on direct examination that he looked inside and saw the gun under the driver's seat, after the drug dog had been in the car. Because the testimony is not so inconsistent to find that it is "unbelievable on its face," the jury could determine whether to believe Detective Velez's testimony. *See Thompson*, 422 F.3d at 1291.

Similarly, it was for the jury to determine whether to believe the testimony of Jefferson or FBI Agent Lofton to the extent there were inconsistencies. *See Hamaker*, 455 F.3d at 1334. When Jefferson was told the gun had been found, FBI Agent Lofton testified Jefferson said: "That's why I didn't want you to search the vehicle." R37 at 238. Jefferson testified he told the officers he had borrowed the car and did not know anything about the gun. Because FBI Agent Lofton's testimony is not incredible, the jury's credibility determination prevails. *See Flores*, 572 F.3d at 1263. Since Jefferson chose to testify, the jury was entitled to disbelieve his testimony and to conclude the opposite of what he said was true. *See Brown*, 53 F.3d at 314.

3. Possession of a Firearm in Furtherance of a Drug-Trafficking Crime (Count 8)

Antwan and Artrell Gray, Rasheed Thompson, Kale, and Kemp argue there was insufficient evidence to convict them of possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c), prosecuted under a *Pinkerton* theory of vicarious liability. Because Jefferson was acquitted of the conspiracy

36

charge, Antwan and Artrell Gray, Kale, and Kemp argue that they cannot be liable for Jefferson's possession of a gun.

If the challenged guilty verdict is supported by sufficient evidence, it stands, although there is an inconsistent verdict on another count.  *See United States v. Mitchell*, 146 F.3d 1338, 1343-45 (11th Cir. 1998).  The Supreme Court has explained:

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." . . . [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense.  It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*United States v. Powell*, 469 U.S. 57, 64-65, 105 S. Ct. 471, 476-78 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 190 (1932)).

To convict a defendant under § 924(c), the government must show the defendant used, carried, or possessed a firearm in furtherance of a drug-trafficking crime.  *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004) (per curiam).  A defendant may be liable under a *Pinkerton* theory for a co-conspirator's gun possession if the possession was reasonably foreseeable.  *United States v. Diaz*, 248 F.3d 1065, 1099-100 (11th Cir. 2001); *United States v. Bell*, 137 F.3d 1274,

1274-75 (11th Cir. 1998) (per curiam).  We have recognized guns and drugs go together.  *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011).  The Fifth Circuit has held that, even if a defendant's co-conspirator has been unindicted or acquitted on the conspiracy charge, the evidence can still be sufficient to sustain a defendant's conviction.  *United States v. Dean*, 59 F.3d 1479, 1490 n.19 (5th Cir. 1995).[15]  We agree.

The trial evidence showed Jefferson had stopped at the residence of Rashard Thompson, a known co-conspirator, and Rashard Thompson went to Jefferson's car for several minutes.  Officers stopped Jefferson for running stop signs.  They located "cut" in a plastic bag in his car and a loaded gun under the driver's seat.  The jury reasonably could have concluded the gun was carried in furtherance of the drug conspiracy, since the gun was stored in the car along with the "cut," which he admitted he sold as cocaine.

A recorded call in which Antwan Gray, Rashard Thompson, and another former co-defendant discussed the details of Jefferson's arrest further showed Jefferson was a co-conspirator.  During that call, Rashard Thompson said he

---

[15] Antwan and Artrell Gray, Kale, and Kemp cite *United States v. Armstrong*, 550 F.3d 382 (5th Cir. 2008), o*verruled on other grounds by United States v. Guillermo Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010), where the Fifth Circuit reversed a nurse's conviction for aiding and abetting the writing of false prescriptions when the doctor, the principal, was acquitted by the same jury for the actual act of writing a false prescription.  The Fifth Circuit reversed the nurse's conviction because "there [was] no evidence that [the nurse] signed the prescriptions herself or otherwise was aware, even if [the doctor] was not, that there was no legitimate medical purpose for the prescriptions."  *Id.* at 394.

warned Jefferson about the car he believed to be police before Jefferson left his house. The call also indicates Rashard Thompson knew Jefferson had cut in his car. Further, when the police stopped Jefferson, he possessed the personal information of several members of the conspiracy, including bank account numbers, routing numbers, and Social Security numbers. Although Jefferson was acquitted of the conspiracy charge, sufficient evidence supported the finding that Jefferson participated in the conspiracy and carried a gun in furtherance of the conspiracy. *See Mitchell*, 146 F.3d at 1345 ("[A]s long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count.").

A gun was located in Antwan Gray's bedroom on November 19, 2009. He also had discussions regarding guns in taped conversations. His former girlfriend, Sherline Richard, testified co-conspirators had shown Antwan Gray they were carrying guns. There was sufficient evidence to support Antwan Gray's conviction on Count 8, since he reasonably could foresee a co-conspirator would possess a gun in furtherance of the conspiracy.

The trial evidence showed Kale carried a gun on his hip and possessed shotgun shells and ammunition during the course of the conspiracy. Kale also testified he previously had carried a gun for protection when drug dealing for drug

39

transactions. Accordingly, a co-conspirator carrying a gun for protection was foreseeable.

Richard testified Kemp carried a semi-automatic weapon. Officers found cartridges and a holder for a magazine in Kemp's car, and a gun box and an empty magazine were located in his residence. This evidence is sufficient to establish Kemp reasonably could have foreseen a co-conspirator would carry a firearm in furtherance of the drug-distribution conspiracy.

There also was sufficient evidence to establish Artrell Gray reasonably could have foreseen a co-conspirator's carrying a firearm. There was an indication in the wiretap there was another gun that was not obtained by the agents during the execution of the search warrant. Sherline Richard testified there were guns at "the four," because they had been moved to Artrell Gray's house when Antwan Gray learned police had found guns while searching a friend's house.

Rasheed Thompson argues that, without the firearm evidence seized on May 11, 2010, there is insufficient evidence to support his § 924(c) conviction based on *Pinkerton*. His participation in the conspiracy was established through former co-defendant McMillian and Sherline Richard's testimony, and through the recorded conversations between Antwan Gray and Rasheed Thompson, wherein they discussed drug deals, drug sources, and drug deliveries. A jury reasonably could have concluded carrying a gun in furtherance of a conspiracy and the commission

of this crime by a co-conspirator was a reasonable, foreseeable consequence of the conspiracy. The district court found in denying Rasheed Thompson's Rule 29 motion:

> [T]he seizure of the gun in the car in which [Rasheed Thompson] [was] a passenger in the front seat and the gun hidden in the center console supports the connection and nexus between narcotics, guns and [rental] cars that [were] utilized by the Defendants during and in furtherance of the conspiracy in this case.

R54 at 85. Viewing the evidence in the light most favorable to the government, the district court correctly found there was more than sufficient evidence to support the jury verdict for all defendants convicted on Count 8.

4. Knowing Possession of Identification Documents (Count 13)

Morley argues the district court erred in denying his acquittal motion on Count 13, because there was insufficient evidence that his possession of five or more identification documents affected interstate commerce. Because Morley did not raise this jurisdictional-nexus argument before the district court, we will affirm his conviction unless there is "a manifest miscarriage of justice." *See United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013). Only a minimal connection to interstate commerce is required to support a conviction under 18 U.S.C. § 1028. *United States v. Klopf*, 423 F.3d 1228, 1236 (11th Cir. 2005). It is sufficient to prove a defendant had intended to accomplish acts that would have affected interstate or foreign commerce. *Id.* at 1237-39.

Sherline Richard's testimony established Morley assisted Sonia Charles and Richard in their identity-theft scheme. The driver's licenses established identity in connection with interstate banking, cash delivery, and credit-card transactions. Morley's possession of fraudulent driver's licenses was an essential part in proving the identity-theft scheme. Even if Morley had not used the driver's licenses, there was evidence he intended to use them, which would have affected interstate commerce. *See Klopf*, 423 F.3d at 1239. The jury could have concluded that the identification documents found in Morley's bedroom would be used to further the identity-theft scheme, which would have affected interstate commerce. There was no miscarriage of justice in Morley's conviction for identity theft.

D. Jury Instructions

1. Buyer-Seller Relationship

Artrell Gray argues that the jury instructions misstated the permissible inferences about membership in a drug distribution conspiracy that can be drawn from a buyer-seller relationship.[16] We review jury instructions deferentially and will reverse only if we have "a substantial and eradicable doubt" regarding whether the jury was improperly guided in its deliberations. *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008) (per curiam) (citation and internal quotation marks omitted). We review de novo in determining if the court misstated the law or

---

[16] Antwan Gray, Morley, and Kemp have adopted this argument.

42

misled the jury to the prejudice of the objecting party. *United States v. Richardson*, 233 F.3d 1285, 1292 (11th Cir. 2000).

While the existence of a buyer-seller relationship is not enough to establish a drug conspiracy, "an agreement to distribute drugs may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to a purchaser." *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005) (citation, internal quotation marks, and alterations omitted). A conspiracy can be proved by showing drug traffickers consistently engaged in a "series of smaller transactions that furthered the conspiracy's ultimate object of supplying the consumer demand of the market." *United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009) (citation, internal quotation marks, and alterations omitted).

The district court instructed the jury: "The existence of a simple buyer-seller relationship alone doesn't establish proof of conspiracy. Nevertheless, an agreement to distribute drugs may be inferred when the evidence shows a continuing buyer-seller relationship that results in the transfer of illegal drugs to a buyer for distribution." R62 at 208. Artrell Gray argues there was no evidence he was involved in repeated sales and purchases of large quantities of marijuana, cocaine, crack cocaine, and MDMA/Ecstasy, and that the instructions improperly allowed the jury to infer his membership in the charged conspiracy without such

43

evidence. Artrell Gray cannot establish prejudice, because his proposed jury instruction, which listed seven factors to be considered, did not include a finding that he dealt in "large amounts of drugs." R5-916. In addition, the jury instructions regarding buyer-seller relationships were legally accurate and could not have misguided the jury.

## 2. Lesser-Included-Offense Instruction

Rashard and Rasheed Thompson, Artrell Gray, Morley, and Kemp contend the district court erred in refusing to instruct the jury that conspiracy to possess narcotics is a lesser-included offense of conspiracy to possess with intent to distribute. We review a district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Lee*, 68 F.3d 1267, 1273 (11th Cir. 1995). "An abuse of discretion occurs where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Jayyousi*, 657 F.3d 1085, 1113 (11th Cir. 2011) (citation and internal quotation marks omitted).

A defendant is entitled to a jury instruction on a lesser-included offense if (1) the charged offense encompasses all of the elements of the lesser offense, and (2) the evidence would permit a rational jury to find him guilty of the lesser offense and not the greater. *See United States v. Williams*, 197 F.3d 1091, 1095 (11th Cir. 1999); *United States v. Langston*, 903 F.2d 1510, 1512 (11th Cir. 1999)

(per curiam); *see also Keeble v. United States*, 412 U.S. 205, 208, 93 S. Ct. 1993, 1995 (1973) ("[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."). In the context of possession and distribution of drugs, we have held that a lesser-included offense instruction is not required where the evidence is inconsistent with a defendant's possession of drugs for personal use. *See Lee*, 68 F.3d at 1273 (holding a defendant was not entitled to a jury instruction on the lesser-included offense of simple possession where there was "no significant evidence presented to support the possibility that the crack cocaine in [his] pocket was for his personal use"); *United States v. Pirolli*, 742 F.2d 1382, 1387 (11th Cir. 1984) (holding a defendant was not entitled to an instruction on possession of cocaine, a lesser-included offense of possession with intent to distribute cocaine, because the drug quantities involved were "too great for personal use").

The district court denied the defendants' requested jury instruction on the ground that conspiracy to possess narcotics is not a lesser-included offense of conspiracy to possess with intent to distribute, because the two offenses do not share "the same elements." R60 at 35. The court's legal conclusion was in error. By definition, a lesser-included offense does not contain each and every element of the greater offense, but only "a subset of the elements of the charged offense."

*Schmuck v. United States*, 489 U.S. 705, 716, 109 S. Ct. 1443, 1450 (1989). And every circuit to have addressed the issue now before us has held conspiracy to possess a controlled substance is a lesser-included offense of conspiracy to possess with intent to distribute that substance. *See United States v. LaPointe*, 690 F.3d 434, 440 (6th Cir. 2012); *United States v. Boidi*, 568 F.3d 24, 28 (1st Cir. 2009) ("[A] vertical 'conspiracy to possess drugs with intent to distribute' can easily be said to be a 'conspiracy to possess drugs' with one added element, namely, that the parties also had a shared aim that the possessed drugs then be distributed."); *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994); *United States v. Baker*, 985 F.2d 1248, 1259 (4th Cir. 1993); *United States v. Miller*, 939 F.2d 605, 609 (8th Cir. 1991). We similarly have recognized that possession of a controlled substance is a lesser-included offense of possession with intent to distribute a controlled substance, *see Lee*, 68 F.3d at 1273, and we can discern no cogent reason why that reasoning should not also apply where the charged offense is a drug distribution conspiracy.

Nevertheless, despite the district court's error, the defendants were not otherwise entitled to a jury instruction on the lesser-included offense of conspiracy to possess narcotics because a rational jury could not have found them guilty of that lesser offense and acquitted them of the charged distribution offense. As we have already recounted, the evidence presented at trial showed that Rashard and

Rasheed Thompson, Artrell Gray, Morley, and Kemp conspired to distribute the drugs that they possessed, including the presence of digital scales, baggies filled with drugs, and other items and packaging methods commonly used to distribute drugs. There was no evidence on which a jury could rationally conclude that the defendants conspired to possess the drugs but not with a shared intent to distribute them. Because the evidence would not support a verdict for conspiracy to possess only for personal use, the defendants were not entitled to lesser-offense instruction on conspiracy to possess narcotics.

## E.  Severance Motions

Morley and Jefferson appeal the denial of their motions to sever. "It is well settled that defendants who are indicted together are usually tried together," and this principle "is particularly true in conspiracy cases." *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007). When a district court does not sever defendants' trials, they have the "heavy burden" of showing "compelling prejudice" from the joint trial. *Id.* (citation and internal quotation marks omitted). "The jury's ability to reach different verdicts as to different defendants is one factor that signifies the jury's ability to make individualized determinations." *United States v. Diaz*, 248 F.3d 1065, 1101 (11th Cir. 2001).

Morley argues the district court should have granted his motions for severance and a mistrial because his co-defendants' possession of guns was not

relevant to the drug distribution conspiracy; therefore, the spillover effect led to his conspiracy conviction.  A denial of a motion to sever will not be reversed absent an abuse of discretion.  *United States v. Slaughter*, 708 F.3d 1208, 1213 (11th Cir.), *cert. denied*, 133 S. Ct. 2868 (2013).  The district court recognized firearms are tools of the drug-trafficking trade and admitted evidence of firearms possession as inextricably intertwined evidence and direct evidence pertaining to Count 1, conspiracy to possess with intent to distribute drugs, and Count 8, using a firearm in furtherance of a drug conspiracy.  Morley moved for severance and mistrial.  He argued the evidence was prejudicial and without relevance to the drug distribution conspiracy.

Because the evidence could have supported his buyer-seller defense, Morley argues that he could have been convicted as a result of the firearms evidence.  The evidence against Morley, however, was more than sufficient to support his conviction on the conspiracy charge.  Morley's taking over the delivery of drugs while Antwan Gray was on vacation was heard on twelve wire intercepts.  Morley also discussed police surveillance, drug supplies, and drug deliveries.  In addition, Sherline Richard testified she saw Morley have drug-related interactions with Antwan Gray, receive phone calls about drug dealing, and deliver marijuana and cocaine to customers.

48

With the overwhelming evidence of Morley's participation in the drug-distribution conspiracy, his argument that he was prejudiced by the district court's denial of his motion to sever is meritless. *See Diaz*, 248 F.3d at 1101; *see also United States v. Lopez*, 649 F.3d 1222, 1241 (11th Cir. 2011) (recognizing no abuse of discretion in denying the motion to sever when there was overwhelming evidence of the defendant's guilt). Additionally, the jury was instructed to consider the charges against each defendant separately according to the evidence, and the various acquittals show that the jury followed those instructions. *See Lopez*, 649 F.3d at 1238-40; *Diaz*, 248 F.3d at 1101.

Jefferson's argument that his trial should have been severed also is unavailing.[17] Jefferson was acquitted on Counts 1 and 8, showing the jury followed the instruction to consider the evidence separately for each defendant. *See Diaz*, 248 F.3d at 1101. There was sufficient evidence to find Jefferson guilty beyond a reasonable doubt on Count 5, possession of a firearm by a convicted felon. The court did not abuse its discretion in denying Morley's and Jefferson's motions to sever before or during trial. *See Slaughter*, 708 F.3d at 1213.

---

[17] Rashard Thompson attempts to adopt Jefferson's severance argument by reference. But severance issues are fact-specific, requiring a showing of "actual, compelling prejudice." *United States v. Chavez*, 584 F.3d 1354, 1360 (11th Cir. 2009). Accordingly, Rashard Thompson cannot adopt this fact-specific inquiry. *See United States v. Khoury*, 901 F.2d 948, 963 n.13 (11th Cir. 1990).

F.  Sentencing Issues

The defendants appeal various sentencing issues following their convictions.[18]

1.  Drug Quantities/Career-Offender Status

Rashard Thompson, Morley, Kale, and Kemp argue the district court erred in calculating the drug quantities for their sentencing and failed to make individualized drug quantity findings.  They pursue a dead end on appeal, because determining a convicted defendant's Sentencing Guidelines range requires the court to consider the defendant's relevant conduct, including all acts taken, aided, abetted, or caused by the defendant and all reasonably foreseeable actions taken by others in furtherance of the joint criminal activity.  *Chavez*, 584 F.3d at 1367 (citing U.S.S.G. § 1B1.3(a)(1)).

In addition, any error of the court in failing to make sufficiently individualized drug findings or in calculating drug amounts was harmless because Rashard Thompson, Morley, Kale, and Kemp were all sentenced as career offenders under U.S.S.G. § 4B1.1(a), a status they do not challenge.  Therefore,

---

[18] We affirm the sentences of Antwan and Artrell Gray, and Rasheed Thompson, without further comment, because they have failed to raise independently sentencing issues in their briefs and have failed adequately to adopt sentencing issues raised by their co-defendants.  *See* Fed. R. App. P. 28(i) ("In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief."); 11th Cir. R. 28-1(f) ("A party who adopts by reference any part of the brief of another party pursuant to FRAP 28(i) shall include a statement describing in detail which briefs and which portions of those briefs are adopted.").

50

their sentences were based on the career-offender classification rather than on the drug amount involved in their crimes of conviction.

## 2.  Denial of Sentence Variances

Kemp and Jefferson argue the district court erred in refusing to grant downward variances in their sentences.  We review the denial of a motion for a downward variance in a sentence for reasonableness.  *United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009) (per curiam).  The challenging defendant bears the burden of showing his sentence is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors.  *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).  At sentencing, the court is not required to "incant the specific language used in the guidelines" or "articulate its consideration of each individual § 3553(a) factor," so long as the record reflects that the court considered those factors.  *United States v. Bonilla*, 463 F.3d 1176, 1182 (11th Cir. 2006) (citations and internal quotation marks omitted).  We will vacate a sentence "only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (citation and internal quotation marks omitted).

51

The district court did not err in denying Kemp's and Jefferson's motions for downward variances in their sentences. The court noted that it had considered the parties' arguments, the Sentencing Guidelines, and the § 3553(a) sentencing factors. During Kemp's sentencing, the court referenced his criminal background, the need to protect the public, the need to provide stronger deterrence after lenient state sentences had not curbed his recidivism, and the severity of the offenses involved in the conspiracy. Regarding Jefferson, the court referred to his criminal history, the nature of the offense, the need to protect the public, the need for deterrence, and the need to provide adequate punishment. Moreover, the sentences for Kemp and Jefferson were well below the statutory maximum. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (per curiam).

3. Sentence Enhancements

Rashard Thompson and Kale argue the district court erred by enhancing their sentences pursuant to 21 U.S.C. § 851, because the government failed to file a proper notice under § 851(a).[19] We review de novo questions regarding the

---

[19] In their supplemental briefs, Rashard Thompson, Morley, Kale, and Kemp seek to raise a new sentencing issue based on *Alleyne v. United States*, 133 S. Ct. 2151 (2013), in arguing the district court violated their Sixth Amendment rights by using prior felony-drug convictions, although the prior convictions were not set forth in the indictment or found by the jury to have occurred as a matter of fact. Rashard Thompson and Kale attempt to tie the issue to their argument that the government did not satisfy the statutory filing and service requirements of 21 U.S.C. § 851; however, neither defendant raised a constitutional issue based on the Sixth Amendment in their initial briefs. Morley and Kemp failed to raise the enhancement issue at all in their initial briefs. Therefore, all defendants have waived this purported new issue. *See, e.g.*, *United States v. Britt*, 437 F.3d 1103, 1104 (11th Cir. 2006) (per curiam); *United States v.*

adequacy of a § 851 notice.  *United States v. Ramirez*, 501 F.3d 1237, 1239 (11th Cir. 2007) (per curiam).  If the government chooses to seek enhanced punishment for a defendant charged with a drug possession crime under 21 U.S.C. § 841 based on his prior drug convictions, it must file an information with the district court and serve a copy on the defendant or his counsel.  21 U.S.C. § 851(a)(1).  The § 851(a) notice requirement is jurisdictional.  *Harris v. United States*, 149 F.3d 1304, 1306-07 (11th Cir. 1998).  The purposes of the § 851 notification are to allow a defendant to (1) "contest the accuracy of the information," (2) contest whether those convictions are the type that can support the enhancement, and (3) "have ample time to determine whether to enter a plea or go to trial and plan his trial strategy with full knowledge of the consequences of a potential guilty verdict." *Ramirez*, 501 F.3d at 1239-40 (citation and internal quotation marks omitted).

Where a defendant received § 851 notice through a § 851 information filed prior to trial, however, the government need not file another § 851 information after a superseding indictment is later filed.  *United States v. Thompson*, 473 F.3d 1137, 1145-46 (11th Cir. 2006).  The district court did not err in enhancing either Rashard Thompson or Kale's sentence under § 851, because the government filed

---

*Robles*, 408 F.3d 1324, 1326 n.1 (11th Cir. 2005) (per curiam); *United States v. Levy*, 379 F.3d 1241, 1242 (11th Cir. 2004) (per curiam).  Moreover, the Supreme Court held in *Alleyne* that most facts that increase a mandatory-maximum sentence must be submitted to the jury; the Court expressly did not disturb the rule that a judge may find the fact of a prior conviction.  *Alleyne*, 133 S. Ct. at 2160 n.1; *United States v. Carrigan*, 724 F.3d 39, 51 n.4 (1st Cir. 2013).

the original § 851 informations more than one year before the joint trial commenced and listed the specific Florida convictions on which it relied for the enhancements. Because notifications were filed before their trial, Rashard Thompson and Kale had sufficient time to contest whether the Florida convictions could serve as predicate offenses to support the enhancement and to determine case strategies.

Jefferson also contends the district court erred in applying a sentencing enhancement for his use or possession of a firearm in connection with another felony offense. We review whether a firearm was used "in connection with" a felony only for clear error. *United States v. Whitfield*, 50 F.3d 947, 949 & n.8 (11th Cir. 1995) (per curiam). The Sentencing Guidelines provide a four-level enhancement where the defendant "[u]sed or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B).

This enhancement applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. § 2K2.1 cmt. n.14(A). "A firearm found in close proximity to drugs or drug-related items simply '*has*'—without any requirement for additional evidence—the potential to facilitate the drug offense." *United States v. Carillo-Ayala*, 713 F.3d 82, 92 (11th Cir. 2013). Florida controlled-substance standards and schedules list cocaine as a controlled substance. Fla. Stat. § 893.03. It is unlawful for "any person to agree,

54

consent, or in any manner offer to unlawfully sell to any person a controlled substance named or described in [§] 893.03 and then sell to such person any other substance in lieu of such controlled substance." Fla. Stat. § 817.563. A conviction under § 817.563 of the Florida Statutes involving the promised sale of cocaine is a felony. Fla. Stat. § 817.563(1).

During a traffic stop, Jefferson told the officers he sold the incense found in his car to customers as cocaine because they could not tell the difference. MGPD Detective Velez testified a loaded gun was found under the driver's seat of Jefferson's car, and the bag containing the incense was in the passenger's seat compartment. Where a firearm is near drugs or drug-related items, it automatically has the ability to facilitate a drug crime, without the requirement of any additional evidence. *Carillo-Ayala*, 713 F.3d at 92. Despite his testimony to the contrary, when the officers found his gun, Jefferson asserted the hidden gun was the reason he had not wanted the car searched. The district court did not clearly err in enhancing Jefferson's offense level pursuant to U.S.S.G. § 2K2.1(b)(6)(B).

4. Refusal to Accord Mitigating-Role Reduction

Jefferson contends the district court improperly refused to apply a two-level, minor-role reduction in calculating his sentence. The determination of a defendant's role in an offense is a factual finding reviewed for clear error. *United States v. Barner*, 572 F.3d 1239, 1253 (11th Cir. 2009).

55

A mitigating-role reduction in a sentence is based on the extent of the convicted defendant's involvement in the criminal conduct.  U.S.S.G. § 3B1.2.  For a minor role, the defendant is entitled to a two-level reduction.  U.S.S.G. § 3B1.2(b).  The court did not err in declining to apply a minor-role reduction, because Jefferson was convicted of possessing a firearm as a felon, an offense in which he was the sole perpetrator.  Since there was no one else with whom to compare his conduct there was no ground for a role adjustment.

### III.    CONCLUSION

While the evidence in this case varied for each defendant, their convictions are supported by sufficient evidence, and the challenges to their sentences are unavailing.

**AFFIRMED.**